Filed 12/19/13  P. v. Alvarado CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E054118 |
| v. | (Super.Ct.No. FVI901482) |
| EDUARDO GOMEZ ALVARADO et al., | O P I N I O N |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  John M. Tomberlin, Judge.  Affirmed in part and reversed in part.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant Eduardo Gomez Alvarado.

R. Clayton Seaman, Jr., under appointment by the Court of Appeal, for Defendant and Appellant Cesar Roberto Rodriguez.

1

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton and Teresa Torreblanca, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

Three people, bound at their hands and feet, were driven to a remote location in the desert and shot.  Two of the victims died; the third survived.  Following an investigation, defendants and appellants, Eduardo Gomez Alvarado and Cesar Roberto Rodriguez, among others, were charged with numerous crimes, including murder, attempted murder, kidnapping, and street terrorism.  The case against Alvarado and Rodriguez was severed from the case against the other defendants.  Because Alvarado and Rodriguez each made pretrial statements implicating the other, separate juries were empanelled.

The respective juries convicted Alvarado and Rodriguez of two counts of first degree murder, one count of attempted murder, and three counts of kidnapping to commit robbery.  Alvarado's jury also convicted Alvarado of street terrorism.[1]  The juries found true allegations regarding certain special circumstances and sentence enhancements.  Alvarado was sentenced to prison terms of three years, plus 75 years to life, plus life without the possibility of parole.  Rodriguez was sentenced to terms of nine years, plus life, plus life in prison without the possibility of parole.

---

[1]  When Rodriguez's jury was unable to reach a verdict on the street terrorism count, the court declared a mistrial and it was subsequently dismissed.

Alvarado argues the court erred in allowing the testimony of a gang expert and the sufficiency of the evidence supporting gang-related charges and allegations. He also challenges certain jury instructions. We reject his evidentiary arguments and conclude that any instructional error was harmless.

Rodriguez argues the evidence was insufficient to support the convictions for robbery and kidnapping for robbery or the true finding as to the special circumstance allegation that the murders were committed during the course of a robbery. He further argues that, because there was insufficient evidence of robbery, the murder convictions must be reversed because one theory of murder was felony murder based on robbery. Finally, he contends the kidnapping for robbery convictions must be reversed because any robbery was complete prior to the kidnappings. We conclude the evidence is insufficient to establish the true findings as to the robbery special circumstance findings, and otherwise reject Rodriguez's arguments.[2]

## II. FACTUAL SUMMARY

A. *Facts Presented to Both Juries*

On the night of June 23, 2009, a motorist found Luis Romero walking onto Highway 395. Romero had been shot in the face and abdomen and was bleeding. Some of his teeth were missing. The motorist called 911.

---

[2] Each defendant joined in the arguments of the other pursuant to California Rules of Court, rule 8.200(a)(5).

San Bernardino sheriff's deputies responded and followed a trail of blood from where Romero was found to a black Chevrolet Silverado truck about one-quarter mile away.  In the backseat of the Silverado they found the bodies of Eduardo Gomez and Alejandro Martin.  The victims' hands and feet were bound with zip ties.  They had been shot multiple times.  Spent shell casings from .40-caliber and nine-millimeter bullets were on the ground near and inside the truck.

Gomez's body was seated behind the driver's seat; Martin's body was in the middle of the backseat.  There was an empty spot in the seat behind the front passenger seat and, on the floorboard in front of the unoccupied spot, a pair of shoes zip-tied together.  A bullet and human teeth were found in a cup holder in the rear passenger-side armrest.

Alvarado's fingerprint was found on the rear passenger door of the Silverado.

Information provided by Romero led investigating officers to a duplex apartment in South Gate.[3]  A garage was located under the primary living unit.  When officers searched the residence approximately one week after the shootings, it appeared the residents had vacated the premises.  There were no sofas, tables, televisions, chairs, or clothing; there were mattresses on bedroom floors without bedding.  They did find some mail addressed to Flor Iniguez, Romero Junior Cruz, and Jose Perez.  They also found some prescription medicine for Iniguez, an empty box for latex gloves, and a bag with zip

---

[3]  At the time of trial, Romero was believed to be in Mexico.  He did not testify at trial.

ties similar to the ties that bound the victims. Tire tracks in the driveway were similar to tracks found at the desert crime scene.

An asset protection manager for a Target store produced a surveillance videotape showing three people purchasing latex gloves from the store. The three individuals looked like Rodriguez, Perez, and someone known as Skeebie. After leaving the store, the three walked to a black truck and drove toward a McDonald's restaurant located in the parking lot. The store was located less than one mile from the South Gate duplex.

California Highway Patrol Officer Jeffrey Moran, one of the investigating officers, testified as a percipient witness and, over defense objections, as a gang expert. Officer Moran went to a storage facility where Iniguez rented a unit. While he was there, he saw Perez leaving the facility in a car. Officer Moran detained Perez and searched the car. In the trunk of the car, Officer Moran found a black trash bag with a loaded shotgun and a PlayStation 2 box. The box had the phrase "Smoky 13" written on it. Inside the box was a large plastic bag containing approximately two pounds of cocaine. The cocaine had a street value of $35,000. Officer Moran opined that the cocaine was possessed for sale. He also testified that the word "Smoky" was a gang moniker and the number 13 was a reference to the Mexican Mafia.

A search of Iniguez's storage unit revealed numerous household items, including tables and chairs. There was also mail for Iniguez and a cable bill for Perez.

Officer Moran was shown a photograph of markings made at the South Gate duplex that included three dots in the shape of a triangle and the word "Slim." "Slim,"

Officer Moran said, is another moniker and the three dots refers to "mi vida loca," or "my crazy life," which is a marking commonly used by Hispanic gangs.

Officer Moran also testified regarding a search of a van owned by Sabas Iniguez, also known as "Junior." Four large bricks of marijuana, weighing a total of 80 pounds, were found in the van. Such a large quantity, Officer Moran stated, would be held for sale, not personal use.

According to Officer Moran, most cocaine and marijuana sold through Southern California street gangs originate or are funneled through Mexican drug cartels. The most prominent cartel is the El Chapo Guzman, or Sinaloa, drug cartel, which brings into the United States 75 to 90 percent of the narcotics that come from Mexico. The drug cartels work with Hispanic gangs, who distribute the drugs at the street level. In Officer Moran's opinion, the drug cartels qualify as criminal street gangs for purposes of Penal Code section 186.22.[4]

Officer Moran testified to the significance of violence in the drug cartel culture. The cartel will use violence to, among other reasons, take care of "internal problems" by executing members. Officer Moran said that such killings could benefit the cartel in two ways. First, by eliminating rival internal cells and thereby expanding business opportunities for the survivors, and second, by boosting the status within the organization of the person who ordered the killings.

---

[4] All further statutory references are to the Penal Code unless otherwise indicated.

The prosecutor presented Officer Moran with a hypothetical situation that mirrored the facts in this case, including the amount of marijuana and cocaine found in searches of Perez's car and Iniguez's van, a large number of people involved in the kidnapping of victims, and the method of killing (and attempting to kill) the victims. Officer Moran testified that the facts were consistent with drug cartel behavior.

B. *Police Interviews of Defendants*

Rodriguez and Alvarado were interviewed separately by detectives. Videotaped recordings of the interviews were played to the defendants' respective juries. Our summary of the interviews follows.

1. Rodriguez Interview (Heard by Rodriguez Jury Only)

At the relevant time, Rodriguez was living at Alvarado's residence in Buena Park.[5] On June 22, 2009, Rodriguez and someone known as Skeebie were at Alvarado's house in Buena Park when Alvarado received a telephone call from Iniguez, who was known to Rodriguez as "Tia." After he concluded the call, Alvarado told Rodriguez and Skeebie, "let's go." Alvarado drove Rodriguez and Skeebie to a park in a truck owned by "Juan." There, Alvarado met some men that Rodriguez described as "gangster guys." The men spoke of someone who was already at the house and how they planned to "go get him and tie him up," and "wait for the money."

---

[5] Throughout the interview, Rodriguez referred to Alvarado by his nickname, Lalo.

7

When the interviewing officer asked Rodriguez "why they wanted to kidnap 'em," Rodriguez responded: "I have no idea. They did it for money or something. I don't know . . . ." When asked when he learned they wanted to "rip them off," Rodriguez replied: "I think when we were getting there . . . ." Rodriguez understood that he would get some money for being involved, but did not know how much he would get.

Alvarado, Rodriguez, and Skeebie then drove to Iniguez's residence in South Gate. Outside the residence, they again met up with the gangsters. Some of the men had guns. Rodriguez had duct tape. Everyone put on gloves just before entering the apartment so they would not leave fingerprints. As they entered, people pointed guns at Romero, pushed him down, and tied him with duct tape and zip ties.[6] Rodriguez participated by holding Romero down and handing to others the duct tape that was used to bind Romero. Someone used a sock to blindfold Romero.

In addition to Alvarado and Skeebie, Rodriguez identified two of the participants as "Jose" and "Junior," but he did not know the four or five other people who were there. To Rodriguez, it appeared that Alvarado and four "gangster guys" were handling everything; "they were the ones asking for money [and] planning everything."

Someone gave Rodriguez a gun that "looked like a 9." He recalls seeing five guns in the apartment—an Uzi, two other guns, a "little one," and a shotgun. Everyone, at one time or another, was holding a gun; "everybody was switching guns." Although

---

[6] When Rodriguez initially described the events, he said that the victim was already tied up when he arrived at the apartment.

Rodriguez said he never pointed a gun at the victims, he "tapped" the shoulder of one of the victims once with the gun. He later gave the gun to a "gangster guy."

The captors had Romero make telephone calls to get others to come to the house. He could not recall if Romero asked people to bring money.

At some point, someone found a "pretty good size" package of money or drugs that had been "hidden" in the kitchen. Shortly afterward, someone came to the apartment and one of the gangsters took the package outside.

Romero remained captive at the apartment throughout the night.

The next day, Rodriguez was in the garage below the apartment where Junior and Jose were washing a truck when the other two victims came to the apartment. As Rodriguez came up from the garage and into the apartment, Alvarado, Skeebie, and three or four gangster guys were grabbing the two new victims and tying them up. Rodriguez joined in, telling the victims, "don't move, don't move," and handed the other perpetrators duct tape to secure the socks that were used to blindfold the victims. Rodriguez had a gun with him at that time. The victims were threatened with being hit or shot if they moved.

Rodriguez said that people "were telling [the victims] they were gonna ask for money or something like that" and "they were gonna make some phone call[s] . . . ." Rodriguez said he was not involved in this and "was just there like watching 'em."

At some point, Rodriguez, Skeebie, and "Jose" went to get food and beer for everyone. He also bought more gloves at a Target store.

9

In the evening of the second day, the three victims were told that they were going to be taken somewhere and abandoned. They were then moved downstairs and placed in one of the trucks. Meanwhile, Rodriguez, Skeebie, and a gangster cleaned the apartment to get rid of fingerprints and "leave nothing behind." They picked up tape, gloves, and zip ties.

Rodriguez was told they were going to take the victims somewhere and that he was needed to give people a ride back. He believed the victims would be let go.

Everyone got into trucks and drove toward Victorville via Interstate 15. Alvarado, two of the gangsters, and the victims were in the first truck. Rodriguez drove Skeebie in a second truck. Jose and Junior were in a third truck. Two or three "cholos" were in a fourth truck. Rodriguez was not sure if the fourth truck followed the others to Victorville.

Rodriguez parked a short distance away from the truck that carried Alvarado and the victims. One of the gangsters in the lead truck got into the backseat of Rodriguez's truck. Rodriguez saw Alvarado and a second "gangster dude" with guns; he then realized they were going to shoot the victims. He saw "the flashes" and heard the gunshots, and knew the victims had been shot. Alvarado and the other shooter got into the truck with Rodriguez, and Rodriguez drove away. He heard Alvarado and the gangster saying "we got 'em," and someone asked, "what are we gonna do with the gloves[?]"

Rodriguez dropped off the two gangsters at a location off of Interstate 15. He then drove Alvarado and Skeebie back to Alvarado's house and went to sleep.

10

The next morning, he was awakened to find Iniguez (the woman who had originally called Alvarado) and her companion, Roca, in the kitchen. Stacks of money were on the kitchen table. He was told the money was for him. He received $4,000, or $5,000. Alvarado received more than that.

The day after the shootings, Alvarado showed Rodriguez the two guns used in the shootings. One was the "9" that Rodriguez had previously handled in the apartment. Alvarado also asked Rodriguez if he liked the "new watch" he was wearing. Rodriguez believed that Alvarado had taken the watch from one of the victims.

2. Interview of Alvarado (Heard by Alvarado Jury Only)[7]

Alvarado is from Guadalajara, Mexico. He knows Iniguez through Iniguez's boyfriend, "Roca," who is also from Guadalajara. Roca, Iniguez, and Iniguez's nephew, "Junior," sold drugs. Alvarado said that he is in the business of buying and selling cars.

---

[7] During the interview of Alvarado, the interviewing officer placed photographs of the victims and several suspects on the floor of the room. The videotaped interview of Alvarado was conducted in Spanish and played at trial. At the time the videotape was played, the jury was given a transcript of the interview that included both a Spanish transcription and an English translation. The court informed the jury that the videotape was evidence, not the transcript.

On appeal, both parties refer to statements made in the interview by citing to the written transcript only. This not only appears to violate rule 8.204(a)(1)(C) of the California Rules of Court, but makes our review particularly difficult because Alvarado frequently referred to individuals by pointing at the photographs while using pronouns; i.e., without identifying the person by name. The written transcript, which reflects only the ambiguous pronouns, is therefore of limited value. Our summary of the interview is based on our observation of the videotaped recording of the interview, aided by the written transcript.

11

In describing the roles of different participants in this matter, Alvarado explained that there are different "lines," or "cartel[s]." The three victims—Martin, Gomez, and Romero—were from Guadalajara and associated with one line.[8] According to Alvarado, these three were having "problems" with people whom Alvarado described at different times as "mafia," "cartels," people "on top" and "from . . . above," and people "from Guadalajara." These problems included unpaid debts to the people in Guadalajara.

Martin and Gomez (the victims who died) supplied Romero (the victim who survived) with drugs from Guadalajara. Romero, in turn, supplied drugs to Iniguez and Alvarado for sale to others. Iniguez and Alvarado would pay Romero for the drugs and Romero would deliver the money to Martin and Gomez.

In one transaction, Romero, through Iniguez and her companion, Roca, supplied Alvarado with 22 pounds of "weed" (worth $500 per pound) and one pound of "crystal," or "ice." Alvarado planned to sell the drugs. However, thieves stole the drugs from Alvarado.[9] This created a "problem" for Alvarado because he remained indebted to Romero, Gomez, and Martin for the price of the drugs. This problem led to threats against Alvarado and his family.

---

[8] Alvarado referred to Romero as "Goyo" and "Chindungis." Alvarado did not know the names of the other two victims.

[9] In his opening brief, Alvarado states that "[d]uring the course of the interview, it became clear that these robbers were in fact the named victims in this case." We disagree, and find nothing on the pages Alvarado cites to support this statement.

At some point, Iniguez and Roca began working with (or "running with") people, or "gangsters," from another line or cartel. These people "had problems"—"mafia problems," as Alvarado described them—with Gomez, Martin, and Romero.[10] Alvarado was told to stop associating with Romero, Gomez, and Martin.

Alvarado referred frequently to threats against him and his family and believed that a "hit" against him had been ordered. These threats appeared to come from both Romero and Iniguez's people, and arose because of his debt for the stolen drugs and Iniguez's demands that he stop running with Romero.

Two weeks prior to the killings, Iniguez approached Alvarado with a plan to kidnap the victims, rob them, and kill them. Alvarado's role was to arrange for everyone to get together at Iniguez's house. Iniguez told Alvarado that his participation in the plan would cancel his debt to Romero. He would also receive an additional sum of money. Alvarado believed this was a way to, as he put it, "free myself of my problem" and protect his family. The plan was further discussed at a meeting in a restaurant.

Romero was living with Iniguez at that time. Pursuant to the plan, Iniguez's associates—"Junior," "Jose," and unidentified gangsters or "cholos"—entered the house, grabbed Romero, and tied him up. Alvarado was there, but said he was merely "watching." Jose and Junior hit Romero because Romero had not paid a debt.

---

**10** In his opening brief, Alvarado states that "Iniguez's associates had 'mafia problems'" and cites to certain pages of the written transcript of Alvarado's interview. On the referenced pages, Alvarado refers to "these ones" and "they" as having "mafia problems." In the interview, however, Alvarado is pointing to photographs of the three victims, not Iniguez or her associates.

The unidentified "friends" of Junior and Jose had guns. Alvarado initially said he did not have a gun. Later, however, he admitted handling a gun "just to scare them," but explained that he did not threaten anyone with it and did not shoot anyone.

Alvarado explained to Romero that the problem was not with him, but rather between Iniguez and Roca (on one side) and Martin and Gomez (on the other). He told Romero that Romero needed to bring "the things," "like whatever he had, the money or something." Romero then told Junior and Jose where money was located. Alvarado saw others take money that was inside shoeboxes wrapped in plastic. The money was taken out of the apartment and given to Iniguez and Roca.

Alvarado stayed at the apartment that night with Romero.

The next morning, either Alvarado called the other two victims to come to the apartment or he and others made Romero call the victims to tell them to come to the house. At that time, Alvarado knew that Iniguez planned to kill them.

When Gomez and Martin arrived, they were captured, tied up, and initially held in separate rooms. Alvarado said he sat on the couch while the cholos tied them up. The victims were blindfolded with rags and tape. Later, the three victims were placed together in one room.

The victims were told they were being held because of problems they had with people from Guadalajara. They were talked to "somewhat strongly" about their debt of approximately $1 million.

14

The victims were made to call someone to authorize Iniguez's people to pick up marijuana from an outside location.

That night, the victims were walked out to a Chevrolet truck, where Iniguez, Roca, Junior, and Jose tied the victims' feet and hands.

A "cholo" drove the truck that carried the victims. Alvarado, Rodriguez, and Skeebie were in a different truck, which Rodriguez drove. There was a third truck with cholos inside.

The initial plan was to drive the victims to Las Vegas. However, along the way, someone called and told the others to "dump" them in the desert near Victorville.

Alvarado, Rodriguez, and Skeebie remained in a truck as two of the cholos shot the victims. The shooters then ran to another truck and left. After the shootings, Alvarado went to his house.

The day after the shootings, Alvarado, Junior, Jose, Skeebie, and the two shooters met again at a restaurant. They talked about how the victims were shot because they "had problem[s] with other people . . . . [¶] . . . [¶] . . . [f]rom cartels." Someone told them that the incident was reported in the news and that "[s]omeobody [*sic*] had failed" because one person survived and was in critical condition.

Sometime after the shootings, Alvarado received $15,000 for his participation in the crimes.

15

### III.  DISCUSSION

A.  *Rodriguez's Arguments*

    1.  <u>Challenges to the Sufficiency of the Evidence of Robbery as to Conviction for Kidnapping to Commit Robbery and Robbery Special Circumstance</u>

    Rodriguez was convicted of three counts—one for each victim—of kidnapping to commit robbery.  (§ 209, subd. (b)(1).)  In addition, with respect to the convictions for murder, the jury found true the special circumstance allegation that the murders were committed while engaged in the commission of robbery.[11]  (§ 190.2, subd. (a)(17)(A).) On appeal, Rodriguez contends the evidence is insufficient to support the kidnapping convictions or the robbery special circumstance findings.  As we explain below, we hold that the evidence was sufficient to establish the kidnapping to commit robbery convictions as to both defendants and the robbery special circumstance finding as to Alvarado; but conclude that the evidence was insufficient to support the robbery special circumstance finding as to Rodriguez.

    In addressing a challenge to the sufficiency of the evidence supporting a conviction, we "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557,

---

    **11**  The jurors also found true special circumstance allegations that the murders were committed while engaged in kidnapping under section 190.2, subdivision (a)(17)(B).  Rodriguez does not challenge this finding on appeal.

578.) "[A]lthough reasonable inferences must be drawn in support of the judgment, [a reviewing] court may not 'go beyond inference and into the realm of speculation in order to find support for a judgment. A [conviction] which is merely the product of conjecture and surmise may not be affirmed.' [Citations.]" (*People v. Memro* (1985) 38 Cal.3d 658, 695.)

Rodriguez focuses his argument on the lack of evidence establishing robbery. He asserts, for example, that "there is nothing in the record showing that appellant or anyone else actually received any money or drugs from any of the captives or their associates at any time." There was no evidence, for example, that the package of money or drugs that was removed from the duplex ever belonged to the victims or was taken from their immediate presence. There was, he concludes, no "actual proof of the robbery beyond a reasonable doubt."

The problem with this argument is that the prosecution was not required to establish that a robbery occurred. Rodriguez was charged with, and convicted of, three counts of kidnapping to commit robbery in violation of section 209, subdivision (b).[12] This crime does not require proof of a completed robbery. (*People v. Lewis* (2008) 43 Cal.4th 415, 518-519; *People v. Curry* (2007) 158 Cal.App.4th 766, 779; *People v. Beaumaster* (1971) 17 Cal.App.3d 996, 1007 ["a kidnapping for the purpose of robbery may be committed even when the robbery itself fails"].) As our state Supreme Court

---

[12] Section 209, subdivision (b)(1) provides, in part: "Any person who kidnaps or carries away any individual to commit robbery . . . shall be punished by imprisonment in the state prison for life with the possibility of parole."

17

explained: "A defendant may be convicted of kidnapping for robbery even if the robbery is not completed. [Citations.] The defendant need only have the specific intent to commit a robbery when the kidnapping begins. [Citation.] Robbery, on the other hand, requires that the defendant actually gain possession of the victim's property and take it away. [Citation.]" (*People v. Lewis, supra,* at pp. 518-519; see also *People v. Davis* (2005) 36 Cal.4th 510, 565-566.)[13]

It does not appear that Rodriguez is arguing that the evidence was insufficient to establish that he, or the perpetrators he aided and abetted, had the *intent* to commit robbery when the kidnapping began. If he is making that argument, we reject it. Rodriguez told the interviewing detectives that he heard Alvarado and the gangsters at the park planning to tie someone up and "wait for the money." He learned of the plan to "rip them off" shortly before they arrived at Iniguez's home. After Romero is tied up, the perpetrators began asking him questions about money and telling him to make telephone calls. Romero did call people to come to the apartment. When the two later victims arrived the next day and were tied up, the perpetrators sat them on a couch and, according to Rodriguez, told them they were "gonna ask for money or something like that . . . ." Although it is not perfectly clear what Rodriguez heard the perpetrators tell the victims or

---

[13] Kidnapping to commit robbery, or aggravated kidnapping as it is sometimes called, also requires movement of the victim "beyond that merely incidental to the commission of, and increases the risk of harm to the victim over and above that necessarily present in, the intended underlying offense." (§ 209, subd. (b)(2).) Rodriguez does not challenge the sufficiency of the evidence supporting this asportation requirement.

18

what Romero said in his telephone calls to others, his statements are sufficient to permit the inference that the perpetrators had the intent to rob the victims (or someone) of "money or something" at the time they were first seized.[14]  (See *People v. Curry, supra,* 158 Cal.App.4th at p. 779 [evidence must show that the defendants "intended to commit the robbery at the time they held or detained" the kidnapping victim]; *People v. Smith* (1963) 223 Cal.App.2d 225, 234 [the kidnapper must intend "to commit robbery at the time of the original seizing"], overruled on another point in *People v. Hood* (1969) 1 Cal.3d 444, 450.)

Rodriguez argues that a "plausible explanation" for the killings is that the victims did not deliver any money or drugs.  He concludes that "when the captors were not successful in getting what they wanted from their captives, they sought payback."  This argument assumes that the perpetrators kidnapped the victims with the intent to get money or drugs from them, but were unsuccessful.  Although this explanation supports Rodriguez's assertion that there was no completed robbery, it also supports the more pertinent point that the perpetrators' intent at the outset was to rob someone of money or drugs.  Thus, if we accept Rodriguez's explanation that the victims were taken to the desert and shot because the intended robbery was unsuccessful, we would have to

---

**14** Although it is necessary to prove the defendant had the intent to commit robbery when the kidnapping began, it is not necessary to prove that the perpetrators had the intent to rob the person who was kidnapped.  (*People v. Davis, supra,* 36 Cal.4th at p. 566, fn. 19.)  That is, a defendant could be convicted under section 209, subdivision (b), of kidnapping one person for the purpose of robbing another.  (*People v. Davis, supra,* at p. 566, fn. 19.)

conclude that the perpetrators had the intent to commit robbery at the time the kidnapping began.[15]

Under a separate heading, Rodriguez contends that, if a robbery did occur, the convictions for kidnapping to commit robbery must be reversed because the robbery of the package found in the kitchen was completed prior to the asportation of the victims to the place where they were shot. The argument has the same problem as Rodriguez's first argument: He incorrectly assumes that a robbery must occur in order for him to be convicted of kidnapping to commit robbery. As discussed above, it does not. In order to be convicted of kidnapping to commit robbery, "[t]he defendant need only have the specific intent to commit a robbery when the kidnapping begins." (*People v. Lewis, supra,* 43 Cal.4th at pp. 518-519.) Rodriguez does not dispute that there is sufficient evidence of kidnapping; and we conclude there is sufficient evidence that he had the requisite intent to commit robbery when the kidnappings began.

We reach different conclusions with respect to the robbery special circumstance findings as to Rodriguez and Alvarado. Under section 190.2, subdivision (a)(17)(A), the penalty for first degree murder is death or life in prison without the possibility of parole if the following special circumstance is found true: "The murder was committed while the

---

[15] Under his first argumentative heading, Rodriguez asserts that there is insufficient evidence of robbery for purposes of the kidnapping to commit robbery convictions and for the robbery special circumstance findings. Under his second argumentative heading, he asserts that in the absence of evidence of a robbery, the kidnapping to commit robbery convictions and the special circumstance findings cannot stand. Because the second argument assumes the success of the first argument, which we have rejected, it fails as well.

defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit . . . . [¶] . . . [r]obbery in violation of Section 211 or 212.5." Although the statute permits a true finding of the robbery special circumstance based on the *attempted* commission of robbery, as the Attorney General points out, the jurors in this case were instructed that the People must prove the defendants committed robbery; they were not told they could find the robbery special circumstance based on an attempted robbery.

We first address the sufficiency of the evidence presented to Rodriguez's jury. Although the evidence is sufficient to find that the perpetrators had the intent to commit robbery when the kidnapping began (as explained above), there is no substantial evidence in the record (as to Rodriguez) that the murders were committed while engaged in the commission of robbery, or even that a robbery occurred at all. The Attorney General points to the evidence of the package of money or drugs found in the kitchen of the apartment and taken away by one of the gangsters. There is nothing in the evidence presented to the Rodriguez jury that indicates that the package had been taken from anyone. The interviewing detective characterized the package as having been "found" in the residence—a characterization Rodriguez did not dispute. Rodriguez stated only that it had been "hidden somewhere in the kitchen," and said nothing about who had hidden it or how it was found. As for who lived at the residence, Rodriguez referred to the apartment as the home of "Tia," that is, Iniguez. Prescription medication was found at the apartment belonging to Iniguez, and mail was found there addressed to Ms. Iniguez,

21

Romero Junior Cruz, and Jose Perez. There is nothing to connect any of the victims with possession of the apartment, let alone the package hidden in the kitchen.

At one point in the interview, the following took place:

"[DETECTIVE]: . . . did you ever find out how much money they got from these guys?

"RODRIGUEZ: I have no idea the exact, the exact amount.

"[DETECTIVE]: Okay what did you think it was?

"RODRIGUEZ: I have no idea, it looked like a pretty good pack 'cause I told you at first, I don't know if it was drugs or money[,] but it was a pretty big pack."

This colloquy arguably suggests that the package of drugs or money found in the kitchen was taken from the victims. Rodriguez's statement, however, is a response to the interviewer's leading question, which assumed that the package found in the kitchen contained money taken "from these guys." When viewed in this context and in the light of the entire interview, this response does not constitute substantial evidence that the package of drugs or money was taken from the victims.

Because there is no substantial evidence presented to the Rodriguez jury that the murders were committed while the perpetrators were engaged in the commission of a robbery, we reverse the true finding of that special circumstance.[16]

_____

[16] The Attorney General argues that if the evidence is insufficient to support the jury's finding that the murders were committed while the perpetrators were engaged in robbery, we may reduce the special circumstance finding to murder in the course of an *attempted* robbery. There is authority for doing so. (See § 1181, cl. (6); see, e.g., *People v. Martinez* (1999) 20 Cal.4th 225, 241.) However, the Attorney General does not

*[footnote continued on next page]*

The evidence presented to the Alvarado jury is sufficient to support the robbery special circumstance finding. Iniguez told Alvarado of the plan to rob and kill the victims. After Romero was captured, Alvarado told him "to give them the money," or "the things." When the interviewing officer asked Alvarado if Romero gave him the money, Alvarado responded: "Yes, he gave the money to them, and to the other guys." Finally, unlike the evidence against Rodriguez, the Alvarado jury heard Alvarado's statement that Romero was living with Iniguez (i.e., the place from where the packages of money were taken) when the crimes occurred. The Alvarado jury could reasonably infer from these statements that Romero turned over to his captors money or things in his possession by means of force or fear. (See §§ 211, 190.2, subd. (a)(17).) There was thus sufficient evidence to support the robbery special circumstance as to Alvarado.

2. Challenge to the Murder Convictions Based on Insufficiency of the Evidence to Support Robbery Felony-Murder Theory

Rodriguez's jury was instructed on multiple theories of murder, including robbery felony murder and kidnapping felony murder. On appeal, Rodriguez argues that because the evidence is insufficient to support robbery felony murder and the record does not disclose the theory upon which the verdict rested, the conviction cannot stand. We disagree.

---

*[footnote continued from previous page]*
explain how the evidence establishes that the murders were committed during an attempted robbery.

23

As we explained in the preceding part, we agree with Rodriguez that the evidence presented to his jury is insufficient to establish that the perpetrators committed robbery. Thus, there are insufficient facts in the record to support a robbery felony-murder theory as to Rodriguez's murder verdicts. However, Rodriguez does not dispute that the evidence is sufficient to support the alternative theory of kidnapping felony murder.

"[W]hen the prosecution presents its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested, the conviction cannot stand." (*People v. Green* (1980) 27 Cal.3d 1, 69.) However, when, as here, the inadequacy of proof as to one theory is purely factual, "reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) We must "affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Id.* at p. 1130.)

Here, the jury found true the special circumstance allegation that the murders were committed while the defendants were engaged in kidnapping, and Rodriguez does not challenge that finding. Moreover, there is ample evidence to support a kidnapping felony-murder theory. The murder victims were bound with zip ties and duct tape while they were in the South Gate duplex. They were then transported to a remote desert location where, still bound with zip ties, they were shot and killed. In light of the

24

overwhelming evidence supporting the theory of kidnapping felony murder, it is not reasonably probable that the jury's murder verdicts were based solely on the unsupported theory of robbery felony murder.

Even if the inadequacy of the robbery felony-murder theory is a *legal* inadequacy, as Rodriguez contends, the jury's kidnapping special circumstance finding shows the jury necessarily concluded the killing was committed in the course of the kidnapping. (Cf. *People v. Morgan* (2007) 42 Cal.4th 593, 613.) "'Thus, we know that the first degree murder verdict rested on at least one correct theory. [Citations.]' [Citation.]" (*Ibid*.) The murder conviction, therefore, must stand.

B. *Alvarado's Arguments*

    1. <u>Admissibility of Gang Expert Testimony</u>

Alvarado argues that Officer Moran's testimony regarding the El Chapo Guzman cartel was inflammatory and irrelevant and its admission into evidence violated his rights to due process and a fair trial. Alvarado does not appear to challenge any particular testimony by Officer Moran. Rather, he asserts more generally that "[Officer] Moran's extensive testimony about [the El Chapo Guzman] cartel was irrelevant and prejudicial" because Alvarado "was never connected to the cartel."

We review challenges to the admissibility of evidence, including gang evidence, under the abuse of discretion standard. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224-225 (*Albarran*).) The appellant has the burden of establishing an abuse of discretion. (*Id.* at p. 225.)

25

The threshold requirement of relevance is met if Officer Moran's testimony regarding the El Chapo Guzman cartel has a tendency in reason to prove any disputed material fact. (Evid. Code, § 210.) In light of the gang-related allegations made against Alvarado, such facts include whether Alvarado actively participated in a criminal street gang or committed his crimes for the benefit of, at the direction, or in association with a criminal street gang. (§§ 186.22, subds. (a), (b), 190.2, subd. (a)(22).) Alvarado does not appear to dispute that the El Chapo Guzman cartel satisfies the statutory definition of a criminal street gang. The relevance issue thus turns on whether Officer Moran's testimony has a tendency in reason to prove that Alvarado was actively participating in or, in the commission of his crimes, acted for the benefit of, at the direction of, or in association with, the El Chapo Guzman cartel.

Alvarado emphasizes that there was no evidence that he was a member of the El Chapo Guzman cartel or any gang. These assertions are misplaced because the gang allegations in this case do not require proof that Alvarado was a gang member. The substantive gang crime requires active participation in a gang, not gang membership. As our state Supreme Court recently stated: "A person who is not a member of a gang, but who actively participates in the gang, can be guilty of violating section 186.22[, subdivision] (a)." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130; accord, *People v. Johnson* (2013) 57 Cal.4th 250, 259.) As for the gang enhancement, although the defendant must commit the crime for the benefit of, at the direction of, or in association with a criminal street gang and with the intent to promote, further, or assist criminal

26

conduct by gang members, there is no requirement that he be a member of such a gang. (See *People v. Bragg* (2008) 161 Cal.App.4th 1385, 1402; *In re Ramon T.* (1997) 57 Cal.App.4th 201, 207; see also *People v. Albillar* (2010) 51 Cal.4th 47, 67-68 [gang enhancement "does not depend on membership in a gang at all"].) Nor does the gang special circumstance require membership in a gang. (§ 190.2, subd. (a)(22).) Thus, the issue is not whether Alvarado was a member of the El Chapo Guzman cartel, but whether he actively participated in or committed his crimes for the benefit of, at the direction of, or in association with a criminal street gang. Evidence regarding the gang is relevant to these issues regardless of whether Alvarado was a member.

There is ample evidence to support inferences that the crimes committed against Gomez, Martin, and Romero were related to a Mexican drug cartel. In his police interview, Alvarado referred to the drug sellers he was working with as being part of "lines," "cartels," and the "mafia." Romero, Martin, and Gomez, he said, were connected with one line or cartel. Alvarado and Iniguez had been working with Romero to sell drugs supplied by Martin and Gomez from Guadalajara. The "mafia" and "people from Guadalajara," however, had problems with Romero, Martin, and Gomez, including the failure to pay a debt. At some point, Iniguez began working with people from another line or cartel and told Alvarado to stop associating with Romero, Gomez, and Martin. Because of the problems Romero, Gomez, and Martin had with people "from . . . above," a plan was devised to kidnap and kill them. Alvarado had a particular role to play in this plan—to arrange for the victims to get together in one place. Such evidence supports

27

reasonable inferences that the crimes committed against the victims were planned, directed, and perpetrated by and for people connected with a Mexican drug cartel, and that Alvarado committed his crimes for the benefit of, at the direction of, or in association with such people.

If Alvarado had identified the group or cartel to which Iniguez and the other participants were associated, there would be little doubt that a qualified gang expert could testify as to the named cartel's culture, habits, primary purposes, use of violence, and the types of crimes it commits. (See, e.g., *People v. Gonzalez* (2006) 38 Cal.4th 932, 944; *People v. Gardeley* (1996) 14 Cal.4th 605, 619-620; *People v. Gutierrez* (2009) 45 Cal.4th 789, 820.) However, Alvarado did not identify the gang or cartel by name in his interview. He referred only vaguely to lines, cartels, the mafia, and people in Guadalajara. The prosecution's gang expert, therefore, had the additional task of determining and opining as to the identity of the gang involved in the crimes.

In Officer Moran's opinion, the facts regarding the crimes in this case are consistent with the drug cartel behavior, and the most prominent Mexican drug cartel is the El Chapo Guzman drug cartel, a criminal street gang. Officer Moran's opinions are plainly relevant to the case because Alvarado described his participation in the plan to kidnap and kill the victims and indicated that the crimes were carried out on behalf of (and against people associated with) one or more drug cartels with connections to "people in Guadalajara"; Officer Moran's testimony simply links participants in the plan to a particular criminal street gang, viz., the El Chapo Guzman cartel.

28

Alvarado relies on *People v. Covarrubias* (2011) 202 Cal.App.4th 1. In *Covarrubias*, the defendant was arrested after United States border agents found 193 pounds of marijuana in a truck the defendant had driven into the United States from Mexico. (*Id.* at pp. 8-9.) The marijuana was found inside bags of roofing shingles. (*Id.* at p. 8.) The defendant claimed he was a day laborer on his way to see about a roofing job. (*Id.* at p. 9.) An issue at trial was whether the defendant had knowledge of the marijuana in his truck. A customs enforcement special agent testified as an expert on the structure and practices of drug trafficking organizations and their use of "mules," i.e., individuals who transport drugs. (*Id.* at pp. 4, 10.) He opined that a hypothetical person under the circumstances present in that case would have knowledge of the marijuana in the truck. (*Id.* at p. 12.) The Court of Appeal held that the expert's testimony was improper because the prosecution "presented no evidence associating" the defendant with drug trafficking organizations. (*Id.* at p. 16.)

*Covarrubias* is easily distinguished. In that case, the defendant was alone in his truck when the alleged crime was committed. In his postarrest interview with government agents, the defendant gave no indication that anyone else was involved with the transportation of what he ostensibly believed were packages of shingles. (*People v. Covarrubias, supra,* 149 Cal.App.4th at p. 9.) There was, as the court explained, simply no evidence connecting him to any drug trafficking organization. (*Id.* at p. 16.) Here, by contrast, jurors can easily infer from Alvarado's statements that the crimes committed against the victims in this case were perpetrated by, for, and at the direction of, people

29

associated with at least one Mexican drug cartel or "mafia" organization. As discussed above, the fact that Alvarado was not a member of that organization does not mean that evidence regarding the organization was not relevant to the gang charges in this case.

Although expert testimony regarding criminal street gangs is generally admissible in cases involving gang allegations, "trial courts should carefully scrutinize such evidence before admitting it" because it "may have a highly inflammatory impact on the jury." (*People v. Williams* (1997) 16 Cal.4th 153, 193.) Officer Moran's testimony regarding the El Chapo Guzman cartel was not highly inflammatory. Alvarado points to Officer Moran's testimony regarding the head of the El Chapo Guzman cartel, Joaquin El Chapo Guzman. Officer Moran testified, for example, that Guzman had been arrested in 1993 in connection with the killing of a bishop in Guadalajara and sentenced to seven years in prison for drug trafficking and money laundering and later escaped from prison through a laundry cart. Officer Moran further stated that Guzman was indicted by the United States federal government for drug trafficking and sentenced to 50 years. Officer Moran also testified that violence is used by Mexican drug cartels "on both sides of the border . . . to impose their will whether it be fighting for territory or taking out somebody that might be threatening their organization . . . ."

Although the testimony regarding Guzman's crimes and power appear to have little probative value, the comments were brief and not unduly prejudicial or inflammatory, particularly in light of the manner in which the crimes in this case were committed. As for the testimony regarding the use of violence by Mexican drug cartels,

30

such evidence was highly probative of the violent nature and motives of the cartels. (See, e.g., *People v. Gutierrez, supra,* 45 Cal.4th at p. 820.) Such evidence had some tendency in reason to show that the execution style shootings in this case were carried out by people connected with such a cartel. The probative value was not substantially outweighed by any undue prejudice.

Alvarado relies on *Albarran* for support on this point. In that case, the accused and an accomplice fired gunshots at the front of an inhabited house. (*Albarran, supra,* 149 Cal.App.4th at pp. 217-218.) The defendant was not charged with the substantive gang crime. (*Id.* at p. 219.) Although the jury found certain gang enhancement allegations true, the trial court subsequently granted the defendant's new trial motion as to the gang enhancement allegations. (*Id.* at p. 222.) On appeal, the defendant asserted that the trial court, having found the gang evidence was insufficient to prove the gang allegations, should have also concluded the gang evidence was irrelevant and unduly prejudicial as to the underlying substantive crimes. (*Id.* at pp. 222-223.) The Court of Appeal agreed. As the court stated, the "prosecution presented a panoply of incriminating gang evidence," including lengthy testimony about other gang members, "the wide variety of crimes they had committed," and "threats to kill police officers." (*Id.* at pp. 227-228.) This and other gang evidence, the court concluded, "had little or no bearing on any other material issue relating to [the defendant's] guilt on the charged crimes and approached being classified as overkill." (*Id.* at p. 228, fn. omitted.) The court further explained that the gang evidence "had no legitimate purpose in this trial"

31

and that "there was a real danger that the jury would improperly infer that whether or not [the defendant] was involved in these shootings, he had committed other crimes, would commit crimes in the future, and posed a danger to the police and society in general and thus he should be punished."  (*Id.* at p. 230.)

In contrast to the situation in *Albarran*, the present case involves a substantive gang crime count and gang special circumstance allegations, as well as the gang enhancement.  Unlike the isolated shooting in *Albarran*, in which there was little evidence connecting the crime to the defendant's gang, there is ample evidence that the crimes in this case were committed pursuant to a Mexican drug cartel's plan to kill the victims because the victims were having "problems" with the cartel.  Evidence regarding the cartels was thus highly relevant.  Moreover, Officer Moran's testimony appears to be more limited, brief, and less inflammatory in comparison with the extensive gang testimony given in *Albarran*.  Because the gang evidence in this case was both more relevant to the issues and less prejudicial than in *Albarran*, that case does not control the decision here.

    2.  Sufficiency of the Evidence to Support the Gang-related Verdicts

Alvarado contends the evidence is insufficient to support the conviction on the substantive gang crime (§ 186.22, subd. (a)), and the true findings on the gang enhancement and special circumstance allegations (§§ 186.22, subd. (b), 190.2, subd. (a)(22)).

Alvarado asserts that the prosecution was required to prove that, as to each gang-related charge, he "was an 'active member' of a criminal gang organization."[17] He points out that "there was no evidence presented that [he] was a member of a drug trafficking cartel." As discussed in the preceding part, this argument is misplaced; active *membership* in a gang is not an element of the substantive gang crime, the gang enhancement, or the gang special circumstance. The absence of evidence that Alvarado was a gang member, therefore, does not mean there is insufficient evidence to support the conviction and findings.

Although Alvarado need not be a member of a gang, the substantive gang crime and the gang special circumstance require proof that he actively participated in a criminal street gang. (§§ 186.22, subd. (a), 190.2, subd. (a)(22).) "Active participation" in this sense means "involvement with a criminal street gang that is more than nominal or passive." (*People v. Castenada* (2000) 23 Cal.4th 743, 747.) Here, Alvarado testified regarding Iniguez's and the three victims' involvement with selling drugs and their connection to "lines," "cartels," the "mafia," and "people from Guadalajara." This evidence, along with Officer Moran's expert testimony about Mexican drug cartels, is sufficient to support reasonable inferences that Iniguez, the victims, and others involved in the subject crimes were closely connected with a criminal street gang, viz., the El Chapo Guzman cartel. Alvarado's admissions that he was personally involved in the

---

[17] Alvarado placed "active member" in quotation marks and cited to section 186.22, subdivision (b)(1). The phrase, however, does not appear in that statute.

33

distribution of drugs supplied through Romero and in the planning and perpetration of the crimes in this case easily support the conclusion that his participation in the gang was more than nominal or passive.

Alvarado further asserts that the prosecution was required to prove that he "committed a felony 'for the benefit of any criminal street gang.'" Alvarado is quoting the gang enhancement statute, section 186.22, subdivision (b). This, too, however, is not entirely accurate. The prosecution was required to prove that he committed a felony either "for the benefit of, *at the direction of, or in association with* any criminal street gang." (§ 186.22, subd. (b)(1), italics added.) That is, even if the crimes were not for the benefit of the gang, Alvarado is still liable under the statute if they were committed at the direction of or in association with a criminal street gang.

Alvarado explained that Iniguez, who was associated with one line or cartel, approached him with a plan to kidnap and kill the victims. As discussed above, it can be inferred from Alvarado's statements that the victims were being killed because of a debt they owed to, or "mafia problems" they had with, people "on top" and "from Guadalajara." As part of this plan, Alvarado was assigned the task of getting the victims together at Iniguez's house. He understood that his participation would cancel his debt to Romero as well as earn him an additional sum of money. These statements (combined with Officer Moran's testimony identifying Iniguez's and/or Romero's drug cartel as the El Chapo Guzman cartel, a criminal street gang) provide ample support for the findings that Alvarado acted at the direction of and in association with a criminal street gang.

34

Finally, Alvarado contends the evidence was insufficient to establish the intent element of the gang enhancement; namely, that he acted with the "specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) We disagree.

"'[T]he scienter requirement in section 186.22[, subdivision] (b)(1) . . . applies to *any* criminal conduct, without a further requirement that the conduct be "apart from" the criminal conduct underlying the offense of conviction sought to be enhanced.' [Citation.] '[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members.' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1171.)

Here, Alvarado told the officers he knew that Iniguez and the victims were connected with one or more cartels. He also referred to the accomplices whose names he did not know as "gangsters." The jury could thus reasonably infer that Alvarado knew the people he was working with were members of a gang. Because he intended to and did commit the charged felonies along with such known members of a gang, the jury could further infer that he had the requisite intent.

3. Incomplete Instruction on the Natural and Probable Consequences Doctrine

Alvarado contends the court erred by instructing the jury with language that alluded to, but did not explain how to apply, the natural and probable consequences. This error, he contends, was prejudicial and deprived him of his rights to effective assistance

35

of counsel, due process, and a unanimous jury verdict.  We conclude that while the challenged instruction should not have been given, the error was harmless.

(a)  *Background*

At trial, to prove first degree murder and attempted murder, the prosecutor relied on the theory, among others, that Alvarado was an accomplice who aided and abetted the perpetrators of the crimes.  Alvarado and the Attorney General agree that the prosecutor did not rely on the natural and probable consequences doctrine and neither side requested an instruction on that doctrine.

Regarding aiding and abetting, the court gave the following instruction based on CALCRIM No. 400:  "A person may be guilty of a crime in two ways.  One, he or she may have directly committed the crime.  I will call that person the perpetrator.  Two, he or she may have aided and abetted a perpetrator, who directly committed the crime.  A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

In addition to the foregoing language, CALCRIM No. 400 includes, in brackets, the following language:  "Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."  The Bench Notes for CALCRIM No. 400 state that this bracketed language is to be given "[i]f the prosecution is also relying on the natural and probable consequences doctrine . . . ."  (Bench Notes to CALCRIM No. 400 (2011) p. 167.)  In that event, the court should also instruct as to the natural and

36

probable consequences doctrine by giving either CALCRIM No. 402[18] or 403,[19] which

provide instructions on how to apply the natural and probable consequences doctrine in

different situations.  (Bench Notes to CALCRIM No. 400, *supra,* p. 168.)  In particular,

the jury is instructed that it must decide whether the defendant is guilty of a specified

---

[18] CALCRIM No. 402 provides:  "The defendant is charged in Count[s] \_\_\_\_\_ with _____ *<insert target offense>* and in Counts[s] \_\_\_\_\_ with _____ *<insert non-target offense>*.
"You must first decide whether the defendant is guilty of _____ *<insert target offense>*.  If you find the defendant is guilty of this crime, you must then decide whether (he/she) is guilty of _____ *<insert non-target offense>*.
"Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time.
"To prove that the defendant is guilty of _____ *<insert non-target offense>*, the People must prove that:
"1.  The defendant is guilty of _____ *<insert target offense>*;
"2.  During the commission of _____ *<insert target offense>* a coparticipant in that _____ *<insert target offense>* committed the crime of _____ *<insert non-target offense>*;  [¶]  AND
"3.  Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of _____ *<insert non-target offense>* was a natural and probable consequence of the commission of the _____ *<insert target offense>*."

[19] CALCRIM No. 403 provides:  "[Before you may decide whether the defendant is guilty of _____ *<insert non-target offense>*, you must decide whether (he/she) is guilty of _____ *<insert target offense>*.]
"To prove that the defendant is guilty of _____ *<insert non-target offense>*, the People must prove that:
"1.  The defendant is guilty of _____ *<insert target offense>*;
"2.  During the commission of _____ *<insert target offense>* a coparticipant in that _____ *<insert target offense>* committed the crime of _____ *<insert non-target offense>*;  [¶]  AND
"3.  Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the _____ *<insert non-target offense>* was a natural and probable consequence of the commission of the _____ *<insert target offense>*."

"target" offense, whether the charged offense was committed during the commission of the target offense, and whether a reasonable person in the defendant's position would have known that the commission of the charged offense was a natural and probable consequence of committing the target offense. (CALCRIM Nos. 402, 403.)

Here, the court instructed the jury with the bracketed portion of CALCRIM No. 400, despite the fact that the prosecution was not relying on the natural and probable consequences doctrine. It did not further instruct on that doctrine or give either CALCRIM No. 402 or 403. After giving the bracketed portion of CALCRIM No. 400, the court proceeded to give CALCRIM No. 401, which sets forth the requirements regarding aiding and abetting liability.[20]

As the Attorney General concedes, giving the bracketed language in CALCRIM No. 400 when the natural and probable consequences doctrine was not relied on at trial and without the clarifying instructions under CALCRIM No. 402 or 403 was error. (See *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1433 (*Rivas*).) The issue is whether the error was prejudicial.

---

[20] CALCRIM No. 401 provides: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:
"1. The perpetrator committed the crime;
"2. The defendant knew that the perpetrator intended to commit the crime;
"3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND
"4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime."

(b) *Prejudice*

"'With regard to criminal trials, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is "'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process."' [Citation.] "'[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge."' [Citation.] If the charge as a whole is ambiguous, the question is whether there is a "'reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution."' [Citation.]' [Citations.]" (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 182 (*Letner*).)

Here, Alvarado argues that giving the bracketed language from CALCRIM No. 400 without clarifying instructions "allowed the jury to create homespun theories of culpability as to each of the charged crimes . . . ." A similar argument was made and rejected in *Rivas, supra,* 214 Cal.App.4th 1410.[21] As in this case, the trial court in *Rivas* instructed the jury with the language in the bracketed portion of CALCRIM No. 400, but did not give the clarifying instruction under CALCRIM No. 403. (*Rivas, supra,* at p. 1432.) The defendant asserted that the error violated his rights under both state law and the federal Constitution. (*Id.* at p. 1431.) By alluding to the natural and probable consequences doctrine without clarifying it, the defendant argued, "the jury was invited

_____

[21] *Rivas* was decided in March 2013, after the briefs in the present case were filed.

to create avenues on its own, beyond those on which it was instructed elsewhere, to find him guilty of the crimes of which it convicted him." (*Id.* at p. 1432.)

Although the *Rivas* court held that the use of the bracketed language was error, it concluded that the error was harmless. The prosecution, the court explained, did not rely on the natural and probable consequences doctrine to prove the defendant's guilt. (*Rivas, supra,* 214 Cal.App.4th at p. 1434.) The bracketed language was, therefore, "superfluous and, without clarification through CALCRIM No. 403, meaningless." (*Id.* at p. 1433.) Giving the superfluous instruction was harmless, the court concluded, "'because there [was] no reasonable likelihood the jury misunderstood or misapplied the law.'" (*Id.* at p. 1434.) The court therefore rejected the defendant's constitutional and state law claims.

The *Rivas* court relied heavily on the state Supreme Court's decision in *Letner, supra,* 50 Cal.4th 99. In *Letner*, the trial court gave the jury an instruction regarding the natural and probable consequences doctrine without identifying the "target" offenses. (*Id.* at p. 183.) As such, the instructions were incomplete, ambiguous, and erroneous. (*Id.* at pp. 183-184.) The defendant argued that the instruction could have led the jury to indulge in unguided speculation concerning the unspecified target offenses. (*Id.* at p. 184.) The issue, however, was not what the jury could have done, but whether there was "a reasonable likelihood that the jury did so." (*Ibid.*) The court concluded that there was no such likelihood and that the error was therefore harmless. (*Ibid.*)

The reasoning in *Rivas* and *Letner* applies here. As Alvarado concedes, the prosecution did not rely on the natural and probable consequences doctrine. Although the

40

use of the bracketed language from CALCRIM No. 400 was superfluous and therefore erroneous, it is not reasonably likely that the jury misunderstood or misapplied the law. Moreover, because the jury found true the special circumstance allegation that Alvarado committed the murders while engaged in the commission of robbery and kidnapping, it is clear that they were persuaded by the felony-murder theory of first degree murder. Under that theory, the killing of the victims constitutes first degree murder without regard to whether the killings were a natural and probable consequence of the felony. (*People v. Escobar* (1996) 48 Cal.App.4th 999, 1018-1019.) For all these reasons, the instructional error was harmless.

Alvarado further argues that the use of the bracketed language amounted to "state interference" with his right to effective assistance of counsel. He contends that instructing the jury with the bracketed language undercut his counsel's tactical decisions by injecting a new theory of culpability. He relies heavily on *Sheppard v. Rees* (9th Cir. 1990) 909 F.2d 1234. In *Sheppard*, the defendant was charged with one count of murder and the use of a firearm. (*Id.* at p. 1235.) The prosecutor's theory during trial was that the defendant's killing of the victim was premeditated and deliberate following a dispute regarding a drug debt. (*Ibid.*) Following the close of the case to evidence and the initial submission of jury instructions, the prosecutor requested that the jury also be instructed on robbery and felony murder. (*Ibid.*) Defense counsel "immediately" and "strenuously" objected to the proposed instruction, stating: "'It never occurred to me that the People would ever go forward on a theory of felony-murder . . . .'" (*Ibid.*) The court gave the

41

felony-murder instruction and the prosecutor argued that theory to the jury. (*Id.* at p. 1236.)

On appeal from the denial of his petition for writ of habeas corpus, the defendant argued that he did not receive adequate notice to enable him to prepare a proper defense to the prosecution's felony-murder theory. Before the Ninth Circuit, the State of California conceded the point, stating that "'a *pattern of government conduct affirmatively misled the defendant*, denying him an effective opportunity to prepare a defense.'" (*Sheppard v. Rees, supra,* 909 F.2d at p. 1236.) The defendant, the state admitted, "'"was ambushed."'" (*Ibid.*) The Ninth Circuit reversed, concluding that the prosecutor's conduct was "inconsistent with elementary due process" and had denied the defendant "the fundamental right to a fair trial." (*Id.* at p. 1238.)

*Sheppard* has no application here. First, unlike the defendant in *Sheppard*, Alvarado did not object to the challenged instruction at trial or move to reopen the case to introduce evidence on what he now perceives as a new prosecution theory. Alvarado has, therefore, forfeited this argument on appeal. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1204-1205; *People v. Kipp* (2001) 26 Cal.4th 1100, 1131-1132.) Second, as discussed above, in contrast to the prosecutor's use of the felony-murder instruction in *Sheppard*, the prosecutor in this case did not rely on the natural and probable consequences doctrine or the challenged instruction. There was, in short, no new theory of culpability to which Alvarado needed to respond; Alvarado was not ambushed in any way. Thus, even if the claim was not forfeited, it is without merit.

4. Failing to Instruct as to Target Offenses for Which Second Degree Murder is a Natural and Probable Consequence

Alvarado next argues that the court erred in failing to instruct the jury how it could use the natural and probable consequences doctrine to convict him of second degree murder. More specifically, he contends the court was required to instruct the jury as to the particular target crimes for which a natural and probable consequence is second degree murder.[22] We reject this argument.

As explained in *People v. Prettyman* (1996) 14 Cal.4th 248, the sua sponte duty to instruct as to target crimes "arises only when the prosecution has elected to *rely* on the 'natural and probable consequences' theory of accomplice liability and the trial court has determined that the evidence will support instruction on that theory." (*Id.* at p. 269.) As noted in the preceding part, the prosecution did not rely on the natural and probable consequences doctrine at trial. There was thus no reason for the court to instruct as to target crimes or explain how to apply that doctrine. There was no error. If the omission was error, it is harmless for the same reasons set forth in the preceding part—because the jury found true the special circumstance allegations that the murders were committed during the course of a robbery and kidnapping, it is clear that they were persuaded by the felony-murder theory of first degree murder.

---

[22] According to Alvarado, the target offense would need to be "a crime less than robbery or kidnap and premeditated murder was not a natural and probable consequence of that crime."

43

5.  Instructions Regarding Murder, and the Special Circumstance Instructions Regarding Lying-in-wait, and Gang Participation

Alvarado next contends the court erred by instructing the jury as to murder and the special circumstances of lying-in-wait and gang participation without modifying those instructions in light of the prosecution's theory of accomplice liability.  We reject this argument.

Regarding aiding and abetting, the court gave CALCRIM No. 401.  (See *ante*, fn. 20.)  The court then instructed as to the elements of murder in accordance with CALCRIM Nos. 520 and 521.  Consistent with these pattern instructions, the jury was instructed, in part, that:  "To prove that a defendant is guilty of this crime, the People must prove that:  [¶]  1.  The defendant committed an act that caused the death of another person;  [¶]  AND  [¶]  2.  When the defendant acted, he had a state of mind called malice aforethought."

On appeal, Alvarado argues that these instructions are problematic for two reasons.  First, although he was tried on an accomplice theory, the murder instruction is phrased "as if Mr. Alvarado was one of the actual shooters."  For example, the instruction that the defendant must commit "an act that caused the death of another person" was not, Alvarado contends, "particularly useful here" because there was no evidence that he committed the acts that caused death.  Similar arguments are made as to the lying-in-wait and gang participation instructions.  Second, by including definitions of express and implied malice as part of the instructions on murder, the court effectively eliminated the

44

requirement of accomplice liability that the defendant intend to aid and abet the perpetrator.

Alvarado appears to contend the murder instructions should not have followed the CALCRIM instructions verbatim, but should have been modified to incorporate the instructions regarding aiding and abetting. Although he does not indicate precisely how he believes the instruction should have been phrased, he appears to argue that instead of stating that the "defendant committed an act that caused the death of another person," the instruction should have been modified to say that "*a perpetrator* committed an act that caused the death of another." The instruction, "When the defendant acted, he had a state of mind called malice aforethought," would apparently need to be modified to: "When *the perpetrator* acted, he had a state of mind called malice aforethought."

Regarding the lying-in-wait and gang participation instructions, Alvarado is more explicit. Regarding lying-in-wait, he argues that the court should have instructed the jury in accordance with CALJIC No. 8.80: "If you find the defendant was not the actual killer [you must find] beyond a reasonable doubt that such defendant with the intent to kill, *aided, . . . abetted or* assisted any actor in the commission of the murder in the first degree." Regarding the gang special circumstance, Alvarado argues the jury should have been additionally instructed: "[I]f you find that a defendant was not the actual killer . . . , you cannot find the special circumstance to be true as to that defendant unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, . . . or assisted . . . the commission of the murder in the first degree."

45

The arguments are rejected for two reasons.  First, Alvarado never objected to the instructions or requested the modifications or clarifications he says should have been made.  A party who did not request clarifying language in the trial court cannot "complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete . . . ."  (*People v. Lang* (1989) 49 Cal.3d 991, 1024.)  Alvarado has, therefore, forfeited these arguments on appeal.

Second, Alvarado views the instructions in isolation and incorrectly assumes the jury did so as well.  The jury was expressly instructed to consider all the instructions together.  We presume that jurors are intelligent and capable of understanding, correlating, and applying the court's instructions.  (*People v. Gonzales* (2011) 51 Cal.4th 894, 940; *In re Lucero* (2011) 200 Cal.App.4th 38, 51.)  Moreover, in reviewing a claim of jury misinstruction, we must also consider the instructions as a whole, not as isolated parts.  (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248; *People v. Chavez* (1985) 39 Cal.3d 823, 830.)  The issue is whether it is reasonably likely the instructions, viewed in context with other instructions, were applied by the jury in an impermissible manner.  (*People v. Houston* (2012) 54 Cal.4th 1186, 1229; *People v. Jennings* (2010) 50 Cal.4th 616, 677.)

Here, the jury was properly instructed as to the requirements of aiding and abetting liability.  Although the instructions regarding murder, lying-in-wait, and gang participation use the word "defendant," the jurors would reasonably comprehend that, in the context of determining whether Alvarado was an accomplice to such crimes, the

46

"defendant" refers to the perpetrator of the crime who was allegedly aided and abetted by Alvarado. The jurors would likely understand that such instructions do not replace or negate the specific instructions regarding accomplice liability when the prosecution is relying on that theory. Accordingly, viewing the instructions together and in their context, we conclude it is not reasonably likely the jury applied them in an impermissible manner.

6. Corpus Delicti Instruction

Over defense counsel's objection, the court gave the jury the following corpus delicti instruction based on CALCRIM No. 359: "A defendant may not be convicted of any crime based on his out-of-court statements alone. You may only rely on the defendant's out-of-court statements to convict him if you conclude that other evidence shows that the charged crime was committed. [¶] That other evidence may be slight and need only be enough to support a reasonable inference that a crime was committed. [¶] *The identity of the person who committed the crime, the degree of the crime, and the special circumstance of murder in the course of robbery, murder in the course of kidnap may be proved by the defendant's statements alone.* [¶] You may not convict the defendant unless the People have proved his guilt beyond a reasonable doubt." (Italics added.)

On appeal, Alvarado argues that the part of the instruction we italicized "fundamentally undercut the state's burden of proof as to the first-degree murder counts" because "Alvarado's statements themselves did not contain proof beyond a reasonable

47

doubt of either the degree of the crime or the felony murder special circumstance." The argument is without merit. First, the instruction did not, as Alvarado seems to suggest, inform the jury that Alvarado's statements contained proof beyond a reasonable doubt of the degree of the crime or the felony-murder special-circumstance allegations. It merely stated that such matters "*may be* proved by defendant's statements alone." This is a correct statement of law. (See *People v. Cooper* (1960) 53 Cal.2d 755, 765 [when the corpus delicti of the crime is established by independent evidence, the statements of the accused may be used to establish the degree of the crime]; accord, *People v. Weaver* (2001) 26 Cal.4th 876, 929-930; §§ 190.41, 190.2, subd. (a)(17) [corpus delicti of murder during robbery or kidnap special circumstance need not be proved independently of the defendant's extrajudicial statement]; see also *People v. Miranda* (2008) 161 Cal.App.4th 98, 107-108 [corpus delicti rule does not apply to proof of the identity of the perpetrator, the criminal agency of the defendant, the degree of the crime, or facts necessary for a sentence enhancement].)

Second, it is not likely that the statement would be understood as lessening, or undercutting, the prosecution's burden of proof. The challenged language itself says nothing about the burden of proof. Regarding the burden of proof, the jury was not only instructed as to the reasonable doubt standard in accordance with CALCRIM No. 220 early in the charge, but, as part of the corpus delicti instruction, explicitly reminded of that burden in the sentence immediately following the challenged language. Therefore, it

48

is not reasonably likely the jury understood the challenged language as altering the reasonable doubt standard of proof.

7. Felony-murder Doctrine Instruction

Alvarado argues that the court's felony-murder instruction was incomplete and thereby deprived him of his constitutional rights.

The court instructed the jury with a modified version of CALCRIM No. 540B as follows:

"The defendants are charged in Counts 1 and 2 with murder, under a theory of felony murder. [¶] The defendants may be guilty of murder, under a theory of felony murder, even if another person did the act that resulted in the death. I will call the other person the *perpetrator*. [¶] To prove that a defendant is guilty of first degree murder under this theory, the People must prove that:

"1. The defendant committed Robbery or Kidnap;

"2. The defendant intended to commit Robbery or Kidnap;

"3. If the defendant did not personally commit Robbery or Kidnap, then a perpetrator, personally committed Robbery or Kidnap;

"AND

"4. While committing Robbery or Kidnap, the perpetrator caused the death of another person. . . ."

The jurors were further instructed with the requirements of robbery and kidnapping.

49

Alvarado correctly points out that the court modified CALCRIM No. 540B by omitting certain language from paragraph number "3." After the words, "If the defendant did not personally commit Robbery or Kidnap, then a perpetrator," the court should have included the parenthetical phrase "whom the defendant was aiding and abetting." (See CALCRIM No. 540B.) Without these words, the instruction—read in isolation of other instructions—appears to give the jury the option of finding Alvarado guilty of murder if he intended to commit robbery or kidnap, a perpetrator committed robbery or kidnap, and, the perpetrator, while committing the robbery or kidnap, caused the death of another person. Thus, the jury could find Alvarado guilty of murder even if it found that he neither committed robbery or kidnapping nor aided and abetted a perpetrator's robbery or kidnap; indeed, there is no requirement under the instruction given that Alvarado acted at all. This was error.

An instruction that omits or misdescribes an element of an offense is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18. (*People v. Flood* (1998) 18 Cal.4th 470, 503-504.) The inquiry "is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279; accord, *People v. Flood, supra,* at p. 515.) If, for example, other aspects of the verdicts leave no reasonable doubt that the jury made the findings necessary for felony murder, the erroneous instruction was harmless.

(*People v. Chun* (2009) 45 Cal.4th 1172, 1204-1205; *In re Lucero, supra,* 200 Cal.App.4th at p. 50.)

Here, the felony-murder instruction, as given, allowed the jury the option of convicting Alvarado of murder by selecting among two alternative theories of guilt: (1) Alvarado intended to commit and did commit the robbery or kidnap during which a perpetrator caused the death of another; or (2) a perpetrator committed the robbery or kidnap during which a perpetrator caused the death of another. The instruction is flawed only as to the second theory and only by omitting the requirement that Alvarado aided and abetted the perpetrator. If the jury found Alvarado guilty based on the first alternative or if other aspects of the verdicts necessarily show the jury made the aiding and abetting finding that was omitted from the second alternative, the verdict would be unattributable to the error.

Here, the jury did not indicate which option it relied upon to convict Alvarado of felony murder. Nevertheless, the verdicts revealed that the jury found, under separate instructions, that Alvarado was guilty of three counts of kidnapping for robbery—one count for each murder victim and one count for the victim of the attempted murder. The kidnapping for robbery verdicts could have been based upon the finding that Alvarado personally committed kidnapping for robbery or that he aided and abetted others in committing those crimes. If the jury found that he personally committed those crimes, it necessarily made the findings required under the first option of the felony-murder instruction. If the jury based its conviction of the kidnapping for robbery on aiding and

51

abetting, it necessarily made the aiding and abetting finding that was omitted under the second felony-murder option.  In either situation, we are persuaded beyond a reasonable doubt that the murder verdict was unattributable to the instructional error.

## IV.  DISPOSITION

The true findings as to the robbery special circumstances made against Rodriguez are reversed.  In all other respects, the judgments against Rodriguez and Alvarado are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
_____
J.

We concur:

RAMIREZ
_____
P. J.

HOLLENHORST
_____
J.